DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CITY OF LAKE WORTH, FLORIDA,**
Appellant,

v.

**JOSEPH VIERA, LYNN DEMCHAK-VIERA,** and **C.D-V.,** a child,
Appellees.

No. 4D2024-3001

---

**JOSEPH VIERA, LYNN DEMCHAK-VIERA,** and **C.D-V.,** a child,
Appellants,

v.

**CITY OF LAKE WORTH, FLORIDA,**
Appellee.

No. 4D2025-0301

---

[July 22, 2026]

Appeals from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Luis Delgado, Jr., Judge; L.T. Case No. 502019CA001457XXXXMB.

Debbie Maken and Forrest Lee Andrews of Lydecker LLP, Miami, for appellant.

Daniel Lustig, Michael J. Pike, and Talina Bidwell of Pike & Lustig, LLP, West Palm Beach, for appellees.

LOTT, J.

When is a contract ambiguous? And when does the jury, rather than the judge, get to resolve that ambiguity?

In this case, Joseph Viera, a police officer who retired years ago after being injured in the line of duty, sued his former employer, the City of Lake Worth, for breach of a 2018 settlement agreement. The City claimed that the contract obligated it to pay for Viera's medical, dental, and vision insurance. Viera claimed that the contract also required the City to provide other insurance products offered to its employees, such as life insurance and accidental death insurance.

There was no dispute as to what benefits the City actually provided. The only dispute was over what the contract required the City to provide. The trial court denied the parties' cross-motions for summary judgment on that question and submitted the issue to the jury. The jury found that the City breached the contract by failing to pay for supplemental benefits worth approximately $135,000 over a six-year period, and awarded Mr. and Mrs. Viera, and their child, (collectively, "the Vieras") damages totaling over $9 million after prejudgment interest.

We need not address the propriety of the damages award. The trial court erred when it denied the City's motion for summary judgment.

The contract was not ambiguous—or at least not ambiguous in such a way that would permit the jury to weigh any evidence and resolve the meaning of the ambiguities as a matter of fact. The plain language of the contract, read as a whole and viewing each term in context, required the City to pay for medical, dental, and vision insurance, and not other supplemental insurance.

Because there was no material dispute that the City provided the benefits it was required to provide, and thus did not breach the contract, summary judgment should have been entered in its favor.[1]

## I. Background

### A. Before the Contract's Execution

Joseph Viera began working for the City of Lake Worth Police Department in April 2000. In December 2000, about six months after he began that employment, he was injured in the line of duty while responding to an emergency call. The City later approved Viera's disability retirement in good standing, effective June 22, 2001. Viera was also

---

[1] We affirm without comment the trial court's decision in the consolidated appeal, No. 4D2025-0301.

awarded Social Security Disability Insurance benefits beginning June 1, 2003.

In 2008, Viera and the City settled his workers' compensation case. In that settlement, the City acknowledged Viera was permanently and totally disabled, and the settlement included a carveout preserving the City's future obligations, if any, under section 112.19(2)(h)1., Florida Statutes (2008). The parties later disputed whether Viera continued to qualify for statutory health-insurance benefits after the workers' compensation settlement.

In 2010, Viera filed a petition for declaratory relief against the City, seeking a judgment that the City was required to pay health-insurance premiums for him and his family under section 112.19(2)(h)1.

After the 2010 action remained dormant for several years, the City moved to dismiss on statute-of-limitations grounds, and the trial court granted the motion. Viera appealed, and this Court reversed in part. This Court held that section 112.19(2)(h)1. created a statutory entitlement to health-insurance benefits paid periodically over time, so Viera's claims for benefits accruing after January 2006 were not time-barred. *Viera v. City of Lake Worth, Florida*, 230 So. 3d 484, 487 (Fla. 4th DCA 2017).

### B. The 2018 Settlement Agreement

After remand, the parties mediated and reached a tentative settlement. The City approved the settlement during a May 2018 shade session,[2] and the parties executed the written settlement agreement dated May 15, 2018.

The agreement resolved the parties' dispute over the Vieras' statutory entitlement to future health-insurance benefits. In the agreement, the City acknowledged that, "as of the date" of the agreement, Viera met the qualifications for benefits under section 112.19(2)(h)1., Florida Statutes. The City also agreed that Viera would not be required in the future to provide additional proof of his entitlement to those benefits.

In exchange, the Vieras released the claims asserted in the 2010 petition concerning their section 112.19(2)(h)1. rights, and the City agreed

---

[2] "A 'shade meeting' is a meeting held pursuant to section 286.011(8), which creates an exemption to the Sunshine Law to permit counsel for public bodies to obtain nonpublic advice from public bodies concerning 'settlement negotiations' and 'strategy sessions related to litigation expenditures' regarding pending litigation." *Anderson v. City of St. Pete Beach*, 161 So. 3d 548, 551 n.2 (Fla. 2d DCA 2014).

to pay $75,000 for past medical expenses. The agreement also stated that the "[p]ayments and other benefits" the City agreed to provide were benefits the Vieras would not be entitled to receive but for the agreement.

The provisions most relevant to this appeal are sections 7(l), 7(m), 7(o), and 14. Section 7(l) defines the "health insurance benefits contemplated under this Agreement" as "those health insurance benefits that the CITY provides to its benefits eligible employees and retired employees." Section 7(l) then gives the Vieras "the sole right to choose from any provided insurance plans offered by the CITY to its employees or retirees." The same paragraph adds that "the benefits contemplated and offered herein shall be equal to or greater than those offered to the Director of Human Resources or Law Enforcement Officers employed by the City, including the chief of police, if any." Section 7(l) further provides that, for the 2017–2018 plan year, the City "currently offers medical insurance, dental insurance, and vision insurance to its employees and retired employees," which "would be provided to the Petitioners as provided herein."

Section 7(m) separately addresses life insurance. That provision states that Viera "already maintains Life Insurance benefits," that those benefits "will continue in accordance with all terms and conditions previously in place," and that they "will not be impacted by this Agreement."

Section 7(o) requires the City to provide Viera with the same forms and information it provides to its employees and retirees when health-insurance options are being selected. Section 14 then governs payment of premiums and opt-out payments. Under section 14(b), if the Vieras timely opt into coverage offered pursuant to the agreement, the City must ensure that all payments are timely made to any insurance carrier selected by the Vieras and must pay the "entire premium cost of health insurance options selected by the Petitioners within any and all policies offered by the CITY pursuant to this Agreement."

Thus, as relevant here, the agreement required the City to provide and pay for the health-insurance benefits and options offered pursuant to the agreement, while also stating that Viera's preexisting life-insurance benefits would continue separately and would not be affected by the agreement.

### C. The Proceedings Below

After executing the settlement agreement, the Vieras selected health, prescription, dental, vision, life, and supplemental insurance policies during the City's open-enrollment process. The City paid the Vieras' health, prescription, dental, and vision insurance premiums, but did not

pay premiums for life or supplemental policies. The Vieras then notified the City that it was in breach of the settlement agreement. When the City did not cure the alleged breaches, the Vieras filed the underlying action for breach of contract and declaratory and injunctive relief.

The parties filed competing motions for summary judgment concerning the meaning of the settlement agreement and the scope of the City's insurance obligations. The City argued that the agreement required it to pay only for medical, dental, and vision coverage, which the City maintained it had provided. The Vieras argued that the agreement required the City to provide broader "health insurance" benefits equal to or greater than those offered to the City's Human Resources Director, including life insurance, accidental death and dismemberment coverage, employee assistance program coverage, and supplemental insurance products. The trial court denied both parties' motions for summary judgment and allowed the case to proceed to trial.

At trial, the central dispute was not what benefits the City had actually paid for, but what benefits the settlement agreement required the City to provide and pay for. The jury was asked whether the City complied with the settlement agreement and whether the City breached specific provisions of that agreement. The jury found that the City failed to comply with the settlement agreement. The jury further found that the City failed to provide payments and benefits under sections 5, 7(l), and 14 of the agreement, and awarded $135,051.96 in compensatory damages, $1,075,000 in liquidated damages, and $3,813,859.19 as a contract buyout.

The jury also found that the Vieras were entitled to benefits under section 112.19(2)(h)1., Florida Statutes, as required by section 7(n) of the settlement agreement, and awarded $1,000,000 in special damages on that theory. The jury found that the City violated section 7(d) of the agreement and awarded another $1,000,000 as a lump-sum payment or buyout remedy under that provision. Finally, the jury found that the City failed to provide records under section 7(e) and statutes covered by section 7(n), and awarded $150,000 in special damages for that breach.

The total damages awarded by the jury were $7,173,911.15.

After trial, the City moved for judgment notwithstanding the verdict, to alter or amend the verdict, or, alternatively, for new trial. The City also moved for remittitur or, alternatively, for new trial on damages. The City argued, among other things, that the trial court should have construed the settlement agreement as a matter of law, that the City had not breached

5

the agreement because it paid the health-insurance benefits required by the contract, and that the jury awarded damages not authorized by the agreement.

The trial court denied the City's post-trial motions. The court found the City's motion for judgment notwithstanding the verdict procedurally barred because the City had not moved for directed verdict at the close of the Vieras' case or at the close of all evidence. The court also found that the City waived any challenge to the jury's interpretation of the settlement agreement by entering into the Joint Pretrial Stipulation and agreeing to proposed jury instructions concerning the disputed contract provisions. In denying remittitur, the trial court found that the total damages award was supported by substantial competent evidence and that the jury's apportionment of damages did not affect the integrity of the verdict. Although the court acknowledged an inconsistency in the jury's lump-sum or buyout findings, it found that the City waived any inconsistent-verdict challenge by failing to object before the jury was discharged.

The trial court entered final judgment for the Vieras and against the City in the amount of $9,974,791.42, plus post-judgment interest. The City appealed the final judgment and all final and nonfinal orders that necessarily merged into the final judgment.

## II. Analysis

The trial court erred by denying the City's motion for summary judgment and submitting to the jury the question of whether the City breached the contract by failing to pay supplemental benefits. The contract was not ambiguous—or at least, not ambiguous in a manner that required resolution by the jury. As a matter of law and the ordinary rules of contract interpretation, the contract's plain language provided that the City was obliged to provide only the benefits that it in fact provided—medical, dental, and vision. Because there is no dispute that it paid these benefits, it did not breach the contract, and the City is entitled to judgment as a matter of law.

### A. Standard of Review

The interpretation of a written contract is reviewed de novo. *Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. 4th DCA 2003). An order granting or denying summary judgment is likewise reviewed de novo. *Volusia Cnty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000). Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(a) (2026).

6

### B. When a Judge, versus a Jury, decides "ambiguity" in a contract.

#### 1. The rule: the court decides whether an ambiguity exists, and then ambiguous language is a question of fact for the jury

"Whether an ambiguity exists in a contract is a question of law[.]" *Torwest, Inc. v. Killilea*, 942 So. 2d 1019, 1020 (Fla. 4th DCA 2006).

But we have held that "[w]hen a contract is ambiguous, an issue of fact is created that cannot be resolved by summary judgment." *Talbott v. First Bank Florida, FSB*, 59 So. 3d 243, 245 (Fla. 4th DCA 2011); *see also Campaniello v. Amici P'ship,* 832 So. 2d 870, 872 (Fla. 4th DCA 2002) ("[W]hen the terms of a written instrument are disputed and rationally susceptible to more than one construction, an issue of fact is presented which cannot properly be resolved by summary judgment."); *see also N. Star Beauty Salon, Inc. v. Artzt,* 821 So. 2d 356, 358 (Fla. 4th DCA 2002) ("A trial court's interpretation of a contract is reviewable by this court under a de novo standard of review provided the language is clear and unambiguous and free of conflicting inferences. In such case of ambiguity, the existence of the ambiguity is a question of law, and the ambiguity must be resolved as a question of fact." (citations omitted)).

Factual determination of ambiguous contracts is necessary because of the ancient rule that evidence extrinsic to the contract itself is admissible (only) to resolve ambiguities. As the Florida Supreme Court has held:

> If a written contract is ambiguous or obscure in its terms, so that the contractual [intention] of the parties cannot be understood from a mere inspection of the instrument, extrinsic evidence of the subject-matter of the contract, of the relations of the parties to each other and of the facts and circumstances surrounding them when they entered into the contract, may be received to enable the court to make a proper interpretation of the instrument.

*Jacobs v. Parodi,* 39 So. 833, 837 (Fla. 1905) (quoting *L'Engle v. Scottish Union & Nat'l Fire Ins. Co.,* 37 So. 462, 467 (1904)); *see Emerald Pointe Prop. Owners' Ass'n, Inc. v. Com. Constr. Indus., Inc.,* 978 So. 2d 873, 877 (Fla. 4th DCA 2008) ("Where contractual terms are clear and unambiguous, the court is bound by the plain meaning of those terms. The intent of the parties by their use of such terms must be discerned from within the four corners of the document. However, when contractual language is found to be ambiguous, extrinsic evidence may be considered

by the court to ascertain the intent of the parties." (citation and quotations omitted)); *accord Contragolpe LLC v. 505 NE 30 St., LLC*, 403 So. 3d 358, 361 (Fla. 3d DCA 2025) ("In the absence of an ambiguity, the intent of the parties to a written contract must be ascertained from the words used without resort to extrinsic evidence." (cleaned up)).

"An agreement is ambiguous if as a whole or by its terms and conditions it can reasonably be interpreted in more than one way." *Hillcrest Country Club Ltd. P'ship v. Zyscovich, Inc.*, 288 So. 3d 1265, 1269 (Fla. 4th DCA 2020) (citation omitted). "Language in a contract is ambiguous where it is fairly susceptible to more than one interpretation." *Torwest,* 942 So. 2d at 1020 (quotation omitted). "[W]here the contract is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract, the agreement is ambiguous." *Miller v. Kase,* 789 So. 2d 1095, 1097–98 (Fla. 4th DCA 2001).

However, "[a] true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. It is the duty of the [courts] to prevent such interpretations." *Hillcrest,* 288 So. 3d at 1269 (cleaned up). "A provision is not ambiguous simply because it is complex or requires analysis . . . ." *Penzer v. Transp. Ins. Co.,* 29 So. 3d 1000, 1005 (Fla. 2010).

We have further broken down ambiguity in contracts into two types—"latent" and "patent." *Prime Homes, Inc. v. Pine Lake, LLC*, 84 So. 3d 1147, 1151 (Fla. 4th DCA 2012) ("There are two types of ambiguities—patent and latent."). "Patent ambiguities are on the face of the document, while latent ambiguities do not become clear until extrinsic evidence is introduced and requires parties to interpret the language in two or more possible ways." *Nationstar Mortg. Co. v. Levine*, 216 So. 3d 711, 715 (Fla. 4th DCA 2017) (citation omitted).

"A patent ambiguity is intrinsically apparent on the face of the document due to the use of defective, obscure, or insensible language." *Id.* (quotations omitted).

"A latent ambiguity, on the other hand, arises when the language in a contract is clear and intelligible, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice between two or more possible meanings." *Id.* (quotations omitted). "A latent ambiguity exists where the language of an agreement is facially clear but an extrinsic fact or extraneous circumstance creates a need for interpretation or reveals an insufficiency in the contract or a failure to specify the rights or duties of

the parties in certain situations." *Id.* (quotations omitted). "[A] latent ambiguity can only be brought to light when extraneous circumstances reveal 'an insufficiency in the contract not apparent from the face of the document.'" *Id.* (cleaned up).

"A significant difference between patent and latent ambiguities is that extrinsic evidence is normally not admissible to construe [patent ambiguities] because its admittance would allow a trial court to rewrite a contract with respect to a matter the parties clearly contemplated when they drew their agreement, whereas extrinsic evidence is admissible to explain a latent ambiguity because doing so is but to remove the ambiguity by the same kind of evidence as that by which it is created." *Id.* (cleaned up); *see also Bd. of Trs. of the Internal Improvement Tr. Fund v. Lost Tree Vill. Corp.*, 805 So. 2d 22, 26 (Fla. 4th DCA 2001) ("Whenever a party presents an arguable claim that a document contains a latent ambiguity, the court is obliged to consider the extrinsic evidence, at least to the extent necessary to determine whether the claimed latent ambiguity actually exists."); *accord Wheeler v. Wheeler, Erwin & Fountain, P.A.*, 964 So. 2d 745, 749 (Fla. 1st DCA 2007) ("Extrinsic evidence is admissible regarding the intent of parties to a contract only if a latent ambiguity exists.").

We have recognized an exception to the rule that extrinsic evidence is inadmissible to resolve a patent ambiguity: "courts allow [extrinsic] evidence regarding identity, capacity, and the parties' relationship with one another even when the ambiguity exists on the face of the document because the court would not be rewriting the terms of the contract." *Nationstar*, 216 So. 3d at 716.

### 2. The "new" twist—the court interprets the whole text of the document in assessing whether ambiguity exists

How, then, is a court to go about determining the legal question of "[w]hether an ambiguity exists?" *Torwest*, 942 So. 2d at 1020.

The answer is by exhausting the ordinary rules of contractual and textual interpretation. *Cf. Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, 771 So. 2d 628, 631 (Fla. 4th DCA 2000) ("The interpretation of a contract is a question of law[.]").

We had long held that "[w]hen the language of a contract is clear and unambiguous, courts must give effect to the contract as written and cannot engage in interpretation or construction as the plain language is the best evidence of the parties' intent." *Talbott*, 59 So. 3d at 245. The somewhat confusing corollary to this maxim was that if a contract is not unambiguous, then it is ambiguous—and ambiguous contracts give rise

9

to questions of fact that should be decided by the jury. *Id.* ("When a contract is ambiguous, an issue of fact is created that cannot be resolved by summary judgment.").

If unambiguous contracts were not to be interpreted, and ambiguous contracts were questions of fact for the jury, when would a court ever interpret a contract? This line of authority left a gap through which the rules of judicial interpretation and construction of contracts may have on occasion fallen.

But the Florida Supreme Court has since abrogated the "misleading and outdated" rule that a clear and unambiguous legal text is not subject to the rules of interpretation. *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022). Rather, "judges must exhaust all the textual and structural clues that bear on the meaning of a disputed text." *Id.* (quotations omitted). "That is because the ***plainness or ambiguity*** of [legal] language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (emphasis added) (quotations omitted). "It would be a mistake to think that our law of [textual] interpretation requires interpreters to make a threshold determination of whether a term has a plain or clear meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute." *Id.*

Although *Conage* concerned a question of statutory interpretation, it is equally applicable to the interpretation of contracts. As the Florida Supreme Court reaffirmed, "[p]rovisions in the texts of statutes and contracts cannot be viewed in isolation from the full textual context of which they are a part." *Allstate Ins. Co. v. Revival Chiropractic, LLC*, 385 So. 3d 107, 113 (Fla. 2024). Our sister district courts have applied *Conage's* holding to the interpretation of contracts. *See City of Gainesville v. Parkwood Alachua Land Invs., Inc.*, 2026 WL 943052, at *10 (Fla. 1st DCA Apr. 8, 2026) (adopting *Conage's* "'full textual context' approach when construing contractual text"); *Paraiso CU-1, LLC v. PRH Paraiso Four, LLC*, 414 So. 3d 271, 274 (Fla. 3d DCA 2025) ("This is a question of contractual construction. We therefore begin our analysis with the words of the text, while remaining cognizant that 'the traditional canons of interpretation can aid the interpretive process from beginning to end.'" (cleaned up) (quoting *Conage*, 346 So. 3d at 598)); *Fla. Farm Bureau Gen. Ins. Co. v. Worrell*, 359 So. 3d 890, 893 n.1 (Fla. 5th DCA 2023) ("While many of the cases in Florida law interpreting legal texts involve interpretation of statutes, these principles of interpretation apply to this Court's work when interpreting contracts."); *16205 Captiva Dr., LLC v. Levinson as Co-Tr. of*

*16201 Captiva Dr. Land Tr. dated Mar. 29, 2010*, 418 So. 3d 751, 755 (Fla. 6th DCA 2025) ("[W]e interpret written agreements according to the plain meaning of their text, looking to 'all the textual and structural clues that bear on the meaning of a disputed text' and using the traditional interpretive canons for guidance where helpful. [*Conage*, 346 So. 3d at 598]. When a contested contractual term is not defined in the contract, we presume the term bears its ordinary meaning at the time of contracting, in context[.]"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 51 (Thomson/West 2012) ("Sections 1–37 of this treatise deal with principles for interpreting all types of legal instruments, from constitutions to statutes to ordinances to regulations to contracts to wills.").

Accordingly, the court's inquiry in deciding "whether an ambiguity exists" means applying the normal rules of textual interpretation to the document and determining as a matter of law the intrinsic meaning of disputed language.

This approach accords with the different roles of the judge and jury. It is, of course, axiomatic that the jury decides issues of disputed fact while the court decides questions of law. *E.g.*, *Alford v. Barnett Nat'l Bank of Jacksonville*, 188 So. 322, 330 (Fla. 1939) (collecting authority).

Indeed, if no evidence goes to the jury, what facts are there for the jury to decide? *Cf. Elias v. Elias*, 152 So. 3d 749, 752 (Fla. 4th DCA 2014) ("When a contract is ambiguous and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties." (citation omitted)). As the First District sagely noted, "[o]nly when an ambiguity exists requiring resolution by resort to extrinsic evidence is a question of fact presented." *Wheeler*, 964 So. 2d at 749; *see also Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001) ("[I]f the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law."); *cf. Mac-Gray Servs., Inc. v. Savannah Assoc. of Sarasota, LLC*, 915 So. 2d 657, 659–60 (Fla. 2d DCA 2005) (Canady, J.) ("Where there is a latent ambiguity affecting a disputed contract provision, there necessarily will be a disputed issue of material fact" and thus "the issue of the correct interpretation of the agreement is an issue of fact which precludes summary judgment." (citation omitted)).

The judge decides the legal questions of contractual meaning that do not require weighing disputed evidence. If evidence is put before the jury, then the jury's job is to weigh that evidence and decide ambiguities

11

brought to bear by that evidence. But purported "ambiguity" intrinsic to the text is resolved by the court based on sound interpretive principles. *Accord Martinez v. Bustamante*, 432 So. 3d 76, 78 (Fla. 3d DCA 2026), *reh'g denied* (Apr. 29, 2026) ("A court generally can't resolve a 'patent ambiguity' in contractual language by examining extrinsic evidence. . . . [T]he patent ambiguity must be resolved, if possible, by relying on the language of the contract as a whole and canons of construction." (citation omitted)); *Washington v. VyStar Credit Union*, 2026 WL 317434, at *8 (Fla. 5th DCA Feb. 6, 2026) ("Florida's courts have, using various legal remedies, generally resolved patent ambiguities as a matter of law.").

### 3. **Putting it together**

In sum, as we have long held: "the existence of the ambiguity is a question of law, and the ambiguity must be resolved as a question of fact." *N. Star Beauty Salon*, 821 So. 2d at 358.

In assessing "the existence of the ambiguity," courts interpret contracts as a whole according to the normal principles of textual interpretation. Courts, not juries, resolve disputes regarding the intrinsic meaning of language that parties may argue is "ambiguous" or otherwise susceptible to different interpretations.

A question of fact may arise where the jury must properly consider and resolve disputed extrinsic evidence bearing on the contract's meaning. Extrinsic evidence generally may be offered to bear on the meaning of a latent ambiguity or, in exceptional cases regarding identity, capacity, and the parties' relationship with one another, a patent ambiguity. In those cases, where there is disputed evidence for the jury to consider that may bear on an ambiguity extrinsic to the text, "the ambiguity must be resolved as a question of fact" by the jury. *Id.*

The familiar rule that ambiguous contracts may present questions of fact remains intact. But that rule applies only after the court has performed its threshold legal task: interpreting the contract as a whole, using ordinary principles of textual interpretation, to determine whether the disputed language is reasonably susceptible to more than one meaning and whether any remaining ambiguity depends on disputed extrinsic facts. Where the material facts are undisputed and the alleged ambiguity can be resolved from the contract's text and structure, the issue remains one of law for the court.

12

## C. Contractual Interpretation

Florida courts' approach to interpreting legal texts, including contracts, "reflects a commitment to the supremacy-of-text principle, recognizing that the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Planned Parenthood of Sw. & Cent. Florida v. State*, 384 So. 3d 67, 77 (Fla. 2024) (cleaned up); *accord Atl. Candy Co. v. Yowie N. Am., Inc.*, 400 So. 3d 850, 854 (Fla. 5th DCA 2025) ("When interpreting any legal text [including contracts], we follow the 'supremacy-of-text principle.'" (cleaned up)).

"In interpreting a [text], our task is to give effect to the words that the legislature has employed in the statutory text." *Lab. Corp. of Am. v. Davis*, 339 So. 3d 318, 323 (Fla. 2022). "We also adhere to Justice Joseph Story's view that every word employed in a legal text is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946–47 (Fla. 2020) (cleaned up). "We strive to determine the text's objective meaning through the application of the text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021) (cleaned up). "This requires a methodical and consistent approach involving faithful reliance upon the natural or reasonable meanings of language and choosing always a meaning that the text will sensibly bear by the fair use of language." *Ham*, 308 So. 3d at 947 (cleaned up).

"Because the plainness or ambiguity of [a text's] language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole," "judges must exhaust all the textual and structural clues that bear on the meaning of a disputed text." *Conage*, 346 So. 3d at 598 (cleaned up). "Viewed properly as rules of thumb or guides to interpretation, rather than as inflexible rules, the traditional canons of [textual] interpretation can aid the interpretive process from beginning to end." *Id.* "Context is a primary determinant of meaning. Under the whole-text canon, proper interpretation requires consideration of 'the entire text, in view of its structure and of the physical and logical relation of its many parts.'" *Lab. Corp.*, 339 So. 3d at 324 (citation omitted); *acccord, e.g., F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 44 (Fla. 4th DCA 2021) ("A contract should be read as a whole. Courts must give reasonable meaning to all provisions of a contract, rather than rendering part of the contract useless. Specific provisions in a contract control over general provisions." (citations omitted)).

## D. Interpretation of the Settlement Agreement

Here, the parties did not ask the trial court to resolve a latent ambiguity created by disputed extrinsic evidence, nor did they proffer extrinsic evidence bearing on identity, capacity, or the parties' relationship that would permit a resolution of a patent ambiguity as a factual matter. Rather, both sides maintained that the settlement agreement was clear and unambiguous and filed competing motions for summary judgment asking the court to construe the agreement as a matter of law. Accordingly, there were no facts for the jury to decide. The court should have interpreted the contract as a matter of law to determine what benefits the contract required the City to provide.

And applying the normal principles of contract interpretation, there is no lingering ambiguity. The plain language of the contract provides that the City's obligation was to provide medical, dental, and vision insurance, and not the supplemental insurance benefits the Vieras' claim.

Section 7(l) defines the "health insurance benefits contemplated under this Agreement" as "those health insurance benefits that the CITY provides to its benefits eligible employees and retired employees." The same paragraph gives the Vieras "the sole right to choose from any provided insurance plans offered by the CITY to its employees or retirees." But that right of selection does not stand alone; it is expressly tied to the "health insurance benefits contemplated under this Agreement." Section 14(b) likewise requires the City to pay the "entire premium cost of health insurance options selected by the Petitioners within any and all policies offered by the CITY pursuant to this Agreement." Read together, those provisions require the City to pay for health-insurance options offered pursuant to the agreement—not all employee benefits or all supplemental insurances available through the City. *See F.H. Paschen*, 311 So. 3d at 44 ("A contract should be read as a whole. Courts must give reasonable meaning to all provisions of a contract, rather than rendering part of the contract useless." (citations omitted)).

The surrounding language within the settlement agreement confirms that much. Section 7(l) states that, for the 2017–2018 plan year, the City "currently offers medical insurance, dental insurance, and vision insurance to its employees and retired employees," and that those benefits "would be provided to the Petitioners as provided herein." That sentence identifies the operative health-insurance benefits the City was agreeing to provide. It does not mention life insurance, accidental death and dismemberment coverage, employee assistance program coverage, hospital indemnity, cancer, critical illness, accident, disability, or other

14

supplemental policies. If the parties intended to require the City to provide and pay for every insurance-adjacent employee benefit offered through the City, they could have said so. Courts may not add that obligation under the guise of interpretation. *See Jacobs v. Petrino*, 351 So. 2d 1036, 1039 (Fla. 4th DCA 1976) ("Where a contract is simply silent as to a particular matter, . . . the court should not, under the guise of construction, impose contractual rights and duties on the parties which they themselves omitted." (quoting *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So. 2d 744, 748 (Fla. 4th DCA 1971))).

Section 7(m) separately addresses life insurance and states that Viera "already maintains Life Insurance benefits," that those benefits "will continue in accordance with all terms and conditions previously in place," and that they "will not be impacted by this Agreement." If the agreement already required the City to provide and pay for new or expanded life-insurance benefits as part of the "health insurance benefits" in section 7(l), section 7(m)'s separate treatment of Viera's existing life-insurance benefits would be difficult to explain. Reading section 7(l) to include life insurance and other supplemental benefits would therefore collapse distinct provisions and render section 7(m) largely superfluous. *See F.H. Paschen*, 311 So. 3d at 44 (requiring courts to give reasonable meaning to all contract provisions rather than rendering part of the contract useless).

The Vieras rely heavily on section 7(l)'s statement that "the benefits contemplated and offered herein shall be equal to or greater than those offered to the Director of Human Resources or Law Enforcement Officers employed by the City, including the chief of police, if any." But that phrase modifies "the benefits contemplated and offered herein." The benefits "contemplated" in section 7(l) are expressly "health insurance benefits." Thus, the Human Resources Director language establishes a floor for the health-insurance benefits the City had to provide; it does not transform every benefit or supplemental policy potentially available to the Human Resources Director into a City-paid benefit for the Vieras. *See City of Pompano Beach v. Beatty*, 222 So. 3d 598, 600 (Fla. 4th DCA 2017) ("[T]he court's task is to apply the parties' contract as written, not 'rewrite' it under the guise of judicial construction.").

Nor does the phrase "any and all policies offered by the CITY pursuant to this Agreement" in section 14(b) expand the City's payment obligation beyond health insurance. Section 14(b) requires the City to pay the "entire premium cost of health insurance options selected by the Petitioners within any and all policies offered by the CITY pursuant to this Agreement." The object of the payment obligation remains "health insurance options," and those options must be offered "pursuant to this

Agreement." That language does not create an independent obligation to pay for every supplemental policy offered by the City, particularly where both sections 7(l) and 14(b) identify the relevant health-insurance offerings as medical, dental, and vision insurance and section 7(m) separately excludes any change to Viera's existing life-insurance benefits. The last sentence of section 14 offers further support for this interpretation inasmuch as it provides for the benefits available under section 112.19(2)(h)1., Florida Statutes, to additional children that Viera may have. "Supplemental benefits" are explicitly excluded from those benefits by statute. It would make little sense to require family coverage for these supplemental benefits to his existing family but only some of the benefits to new children he may have.

The agreement also contains a merger clause, which prevents prior negotiations or understandings from expanding the City's written obligations. The history of Viera's injury, the prior section 112.19 litigation, and the parties' settlement negotiations may explain why the parties entered the agreement. But they cannot be used to add various insurance policies the agreement itself does not require the City to provide and pay for. *See Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 n.1 (Fla. 1st DCA 2005) (explaining that a merger clause supersedes prior representations and agreements).

*     *     *

We do not mean to suggest that this is an easy or clear-cut question. The contractual language is, in the ordinary meaning of the word, "ambiguous" as to whether the City must pay supplemental benefits. Both sides made good-faith arguments concerning how the contract ought to be interpreted on this question.

But there was no material factual dispute for the jury to resolve on the contract's meaning. The parties disputed what the agreement required, but they did not identify competing extrinsic evidence that created a latent (or exceptional patent) ambiguity requiring factfinding by the jury. The disagreement was over the legal effect of the agreement's text and structure. That question belonged to the court.

"Our goal in this exercise is to arrive at a fair reading of the text[.]" *Haddad v. Lyft Florida, Inc.*, 2026 WL 1309854, at *5 (Fla. 4th DCA May 13, 2026) (quotation omitted). "Weighing all the indicia of meaning and giving effect to all the words in context . . . the better reading," *id.*, is that the settlement agreement required the City to provide and pay for the health-insurance benefits identified in the agreement—medical, dental,

and vision insurance—not the supplemental insurance products the Vieras later claimed. Because there was no dispute that the City paid for the medical, dental, and vision benefits, the City did not breach the agreement by declining to pay for life insurance, accidental death and dismemberment coverage, employee assistance program coverage, or other supplemental insurance policies. Accordingly, the court should have granted summary judgment in favor of the City.

## III. Conclusion

Because the settlement agreement's meaning could be resolved as a matter of law from its text and structure, the trial court erred by failing to grant summary judgment in favor of the City. We reverse the final judgment and remand for entry of judgment in the City's favor.

*Reversed and remanded.*

KLINGENSMITH and SHEPHERD, JJ., concur.